UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HARVEY G. VALNES,<br><br>    Plaintiff,<br><br>    v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>    Defendant. | CASE NO. C04-1589-JCC<br><br>REPORT AND RECOMMENDATION RE: SOCIAL SECURITY DISABILITY APPEAL |

Plaintiff Harvey Valnes proceeds through counsel in his appeal of a final decision of the Commissioner of the Social Security Administration (Commissioner). The Commissioner denied plaintiff's application for Disability Insurance (DI) benefits after two hearings before Administrative Law Judges (ALJ).

Having considered the ALJ's decision, the administrative record (AR), and all memoranda of record, it is recommended that the Commissioner's decision be affirmed.

**FACTS AND PROCEDURAL HISTORY**

Plaintiff was born on August 25, 1946. He has a GED education and two years of post-high school education. Plaintiff's prior work experience includes work as a diesel mechanic. He last worked in 1986.

The procedural history of this case is somewhat complicated. Plaintiff was last insured for DI benefits on March 31, 1991. Plaintiff had previously been denied DI benefits in a decision by

REPORT AND RECOMMENDATION
RE: SOCIAL SECURITY DISABILITY APPEAL
PAGE - 1

an ALJ in November 1988.[1]  (AR 108.)  In April 1999, plaintiff again applied for DI benefits, alleging a disability onset date of January 1, 1987.

ALJ Richard Boyle held a hearing on October 26, 2000 and heard testimony from plaintiff. (AR 37-68.)  On January 27, 2001, ALJ Boyle issued a written decision that denied plaintiff's claim. (AR 18-26.)  Plaintiff appealed ALJ Boyle's decision to the Appeals Council.  On February 20, 2002, the Appeals Council found no reason to review the ALJ's decision. (AR 4-5.)  Plaintiff then sought review in this Court, under case number C02-560R.  On October 24, 2002, the parties stipulated to a remand for a new hearing and new decision. (AR 402-03.)

ALJ Verrell Dethloff held a new hearing on April 6, 2004 and heard testimony from plaintiff and Dr. Grant Deger, a medical expert. (AR 1106-134.)  On May 15, 2004, ALJ Dethloff issued a decision denying plaintiff's claim, which constituted the final decision of the Commissioner. (AR 381-98.)  Plaintiff then appealed the decision to this Court.

## DISCUSSION

The Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2000).  At step one, it must be determined whether the claimant is gainfully employed.  The ALJ found plaintiff not gainfully employed since his alleged onset date.  At step two, it must be determined whether a claimant suffers from a severe impairment.  The ALJ found that as of March 31, 1991, plaintiff had "the following severe impairments: lumbar spine degenerative disc disease, status post laminectomy x2." (AR 397.)  Step three asks whether a claimant's impairments meet or equal a listed impairment under 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ found that as of March 31, 1991, plaintiff's impairments did not meet or equal a listed impairment.  If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional

---

[1] The 1988 decision is not included in the administrative record for this case.  ALJ Dethloff stated that the 1988 decision could not be located.  (AR 382 n.2.)  However, plaintiff maintains that there is no indication that the Commissioner actually sought the file.  (Dkt. 14, at 21 n.5.)

capacity (RFC) and determine at step four whether the claimant has demonstrated an inability to perform past relevant work. The ALJ assessed plaintiff's RFC and found him not able to perform his past relevant work as of March 31, 1991. If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate at step five that the claimant retains the capacity to make an adjustment to work that exists in significant levels in the national economy. The ALJ resolved this inquiry by reference to the Medical Vocational Rules (20 C.F.R. pt. 404, subpt. P, app. 2), which directed a finding that plaintiff was not disabled through March 31, 1991.

This Court's review of the Commissioner's decision is limited to whether the decision is in accordance with the law and the findings supported by substantial evidence in the record as a whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Substantial evidence means more than a scintilla, but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If there is more than one rational interpretation, one of which supports the ALJ's decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

In this case, plaintiff asserts that the ALJ erred at step two of the sequential evaluation process by failing to identify all of his severe impairments. Plaintiff argues that this alleged error tainted subsequent findings in the decision. Plaintiff also argues that the ALJ erred at step three by failing to find that his impairment met or equaled a listed impairment. Plaintiff also contests the ALJ's assessment of his RFC, his credibility, and the opinions of the medical expert at the hearing. Plaintiff requests that the Court vacate the Commissioner's decision and order the Commissioner to find plaintiff disabled or, in the alternative, to remand this case for further administrative proceedings. The Commissioner asserts that the decision is supported by substantial evidence and free of legal error.

/ / /

## Plaintiff's Prior Application for DI Benefits

As a preliminary matter, the Court considers plaintiff's assertion that ALJ Dethloff "constructively reopened" plaintiff's previous application for DI benefits, which had been denied by an ALJ in November 1988. This issue has some bearing on whether plaintiff may be eligible for a "closed period" of DI benefits based on a temporary disability between his alleged onset date of January 1, 1987 and his last insured date of March 31, 1991.

Plaintiff's most recent application for DI benefits was filed in April 1999. This application was filed more than eight years after plaintiff was last insured for DI benefits and more than ten years after his previous application for DI benefits had been denied in 1988. In light of these considerations, the ALJ noted:

> [C]laimant must demonstrate that he continued to be disabled from at least his date last insured [March 31, 1991] until "at least twelve months prior to filing his application [in April 1999]." 42 U.S.C. 416(i)(2)(E) Mullis v. Bowen, 861 F.2d 991, 994 (6th Cir. 1988). More accurately stated, claimant must establish that his impairment which was disabling continued to be disabling until <u>14</u> months prior to the date of his application.[2] Compare, 20 CFR 404.315(a)(3), with 404.320(b)(3), and see 404.321(c)(2) and 404.325. Compare, Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1462 (9th Cir. 1994).

(AR 383) (emphasis in original). Under this reasoning, plaintiff would have to show that he was disabled before his last insured date of March 31, 1991 <u>and</u> that this impairment continued to be disabling until at least fourteen months prior to his April 1999 application. Plaintiff would therefore be ineligible for an award of benefits based on a disability that occurred prior to March 31, 1991, but was only temporary.

Plaintiff does not dispute that a claimant generally must be disabled until at least fourteen months prior to the date that he applies for benefits. However, plaintiff argues that the relevant application in this case is not his April 1999 application, but is instead his earlier application for

---

[2] Although 42 U.S.C. § 416(i)(2)(E) provides that an application must be filed at least 12 months before a period of disability ends, it appears that this timeframe may be more accurately stated as 14 months because 20 C.F.R. § 404.325 provides that a period of disability is terminated the third month following the month in which a claimant's impairment is no longer disabling.

01  DI benefits that had been denied in November 1988. To support this argument, plaintiff maintains
02  that ALJ Dethloff "constructively reopened" his previously denied application.
03        Although the Commissioner provides virtually no response to this argument, it does not
04  appear that plaintiff's argument is correct. With limited exceptions that do not appear to be
05  present here, Social Security regulations provide that an application for DI benefits may not be
06  reopened more than four years after the date of the notice of the initial determination. *See* 20
07  C.F.R. § 404.988. The Eighth Circuit has held that reopening an application more than four years
08  after the initial denial "would exceed the authority of the ALJ." *King v. Chater*, 90 F.3d 323, 325
09  (8th Cir. 1996). As such, some courts have held that an ALJ generally lacks the authority to
10  actually or constructively reopen a claim after four years from the notice of the initial
11  determination. *See, e.g.*, *Coates v. Bowen*, 875 F.2d 97, 100-01 (7th Cir. 1989) (ALJ had no
12  authority to reopen case where nine years had elapsed since denial of plaintiff's claim); *Owens v.*
13  *Apfel*, 2004 WL 2725083, at *3 (S.D.N.Y. Nov. 24, 2004) ("a claim cannot be constructively
14  reopened where it could not have been actually reopened"). Therefore, it is questionable that the
15  ALJ possessed the authority in this case to constructively reopen the application that had been
16  denied in 1988.
17        To support his argument regarding a constructive reopening, plaintiff notes that ALJ
18  Dethloff found as follows:

> I have determined . . . that *res judicata* cannot be accorded the prior hearing decision, at least on the issue of the Listing of Impairments. Contrary to the logical notions of efficiency and finality which are the theoretical predicate of the concept of *res judicata*, the Social Security Administration takes the position that whenever there is a change of the agency's regulations, an issue previously settled is no longer settled, because the law has changed. In this case, the musculoskeletal listings have changed since the 1988 Administrative Law Judge decision, notably on effective [sic] February 19, 2002 (66 Fed. Reg. 58040).

24  (AR 387.) In essence, ALJ Dethloff found that *res judicata* did not apply to the 1988 hearing
25  decision (as least with respect to the Listing of Impairments) due to an intervening change in
26  Social Security regulations. However, this determination would not appear to lead to a conclusion

REPORT AND RECOMMENDATION
RE: SOCIAL SECURITY DISABILITY APPEAL
PAGE - 5

that the ALJ constructively reopened plaintiff's earlier application for benefits. Other courts have held that a previously-denied application for Social Security benefits is not constructively reopened in cases involving similar circumstances. *See Kasey v. Sullivan*, 3 F.3d 75, 78-79 (4th Cir. 1993); *Passopulos v. Sullivan*, 976 F.2d 642, 645-47 (11th Cir. 1992). In acknowledging that an intervening change in agency regulations served to remove the *res judicata* impact of the decision issued following the 1988 hearing, the ALJ was not re-opening (either constructively or actually) plaintiff's previous unsuccessful claim. Rather, the lack of *res judicata* impact simply meant that pertinent issues, such as plaintiff's disability under the Listing of Impairments, could be decided under the facts of the current claim even though previously decided in the 1988 decision.

Therefore, it does not appear that ALJ Dethloff constructively reopened plaintiff's application for DI benefits that had been previously denied in 1988. As a result, plaintiff would only be eligible for DI benefits in this case if: (1) he was disabled as of his last date insured of March 31, 1991; and (2) this disability continued until at least fourteen months prior to his April 1999 application for DI benefits.

### Step Two Determinations

At step two, the ALJ found that "[a]s of March 31, 1991, the claimant had the following severe impairments: lumbar spine degenerative disc disease, status post laminectomy x2." (AR 397.) Plaintiff argues that the ALJ erred at step two because he "failed to find Plaintiff's right hip, right leg and right foot pain severe, and failed to find Plaintiff's right foot drop severe." (Dkt. 14, at 13.)

The Commissioner argues that plaintiff's pain in his right hip, leg, and foot is a symptom of plaintiff's severe back impairment, rather than a separate impairment itself. There is substantial evidence in the record to support this position. For example, notes from Dr. Paul Amstutz in March 1987 indicate that plaintiff had developed an exacerbation of his low back pain with an extension of pain down his right leg to his ankle. (AR 311.) Medical records from 1988 indicate that plaintiff had "chronic low back pain radiating into right hip and right leg numbness." (AR

285.) A report by Dr. Cynthia Hahn in November 1988 assessed plaintiff as having lower back pain radiating to the right hip, with numbness in the right leg from the right thigh to toes on the right foot. (AR 289.) A report from Dr. Richard Hartoch in September 1989 also suggests that plaintiff's right foot weakness and sensory changes on his right leg and foot were residual to his back condition. (AR 274.) As such, there is substantial evidence that plaintiff's right foot, leg, and hip pain were symptoms of plaintiff's severe back impairment, rather than separate impairments themselves.

Similarly, the Commissioner argues that plaintiff's right foot drop was a symptom of plaintiff's back impairment, rather than a separate impairment itself. The Commissioner's position appears to be consistent with the testimony of Dr. Deger, the medical expert at the second hearing. When asked by the ALJ to identify plaintiff's lumbar diagnosis, Dr. Deger stated: "The lumbar diagnosis is fifth nerve – right fifth lumbar fifth nerve impingement and foot drop resulting from a permanent injury to the nerve and muscle – to the nerve." (AR 1123.) The record contains additional evidence that plaintiff's right foot drop was residual to his back condition. *See, e.g.*, AR 283.

Plaintiff argues that his right foot drop was a separate impairment, noting that Dr. Deger testified that plaintiff's right foot drop "was the result of a damaged sciatic nerve on the right and muscle atrophy and compatible clinical findings." (AR 1121.) However, as noted above, Dr. Deger subsequently included plaintiff's right foot drop as part of plaintiff's lumbar diagnosis. Therefore, there appears to be substantial evidence to support a finding that plaintiff's right foot drop was a manifestation of his back impairment, rather than a separate impairment itself.

<u>Step Three Finding</u>

At step three, the ALJ must consider whether the claimant's impairments meet or equal one of the impairments in the "Listing of Impairments" set forth in Appendix 1 to 20 C.F.R. Part 404, Subpart P. Plaintiff bears the burden of proving that he has an impairment that meets or equals a listing. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005); *Johnson v. Barnhart*, 390

F.3d 1067, 1070 (8th Cir. 2004). Here, the ALJ found that plaintiff's back impairment did not meet or equal a listing as of March 31, 1991. (AR 391-92, 397.)

Plaintiff contends that he met or equaled Listing 1.04A, which provides that claimants with disorders of the spine will meet a listing if there is:

> Evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation of motion for the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

At the hearing, the ALJ asked Dr. Deger whether plaintiff's back condition would meet or equal a listing during the time period at issue (which the ALJ had previously defined as between 1988 and March 1991). Dr. Deger responded "I don't believe so," but also opined that plaintiff would have met a listing temporarily during this period. (AR 1123). In response to questioning by plaintiff's counsel, Dr. Deger opined that plaintiff would have met a listing between March 1987 and January 1989. (AR 1131.) During that time period, plaintiff had back surgery in March 1987 and November 1988. (AR 384-85.)

The ALJ found that even if plaintiff had temporarily met a listing, such a temporary disability "could not provide a predicate for an award of closed period of benefits" for the period of March 1987 - January 1989. (AR 392.) As discussed earlier, this analysis appears to be correct. Under this analysis, plaintiff may not be awarded benefits for a closed period between 1987-1989 because he needed to demonstrate his impairment continued to be disabling until fourteen months before the date of his April 1999 application for benefits. As such, the question of whether plaintiff temporarily met a listing between March 1987 - January 1989 may be a moot point.

In addition, the ALJ explicitly rejected Dr. Deger's opinion that plaintiff temporarily met a listing between 1987 and 1989. The ALJ noted:

> [T]he specific findings required of listing 1.04 are not present, such testimony is inconsistent with Dr. Deger's endorsement of a sedentary residual functional capacity (and his only equivocal rule out of light) for the period at issue, and such a finding is

01         inconsistent with the VA rating of impairment at only 40% and 60% . . . .

02 (AR 391-92) (internal citations omitted); *see also* AR 389-91 (listing other considerations that

03 factored into ALJ's rejection of Dr. Deger's endorsement of a listing level impairment).

04         An ALJ may reject the opinion of a non-examining physician such as Dr. Deger "by

05 reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244

06 (9th Cir. 1998). The ALJ noted that the specific findings required of listing 1.04 were not present

07 in this case. Although the ALJ did not identify which findings were absent, [3] the Commissioner

08 asserts that there is no evidence that plaintiff recorded positive straight-leg raising tests in both the

09 supine and sitting positions during the period in question, as Listing 1.04A requires. (Dkt. 16, at

10 8-9.) Plaintiff has not identified evidence indicating that positive straight-leg raising tests were

11 performed in both positions during this period. "For a claimant to show that his impairment

12 matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S.

13 521, 530 (1990) (emphasis in original). As such, plaintiff has not met his burden of showing that

14 all of the specified medical criteria of Listing 1.04A were satisfied.

15         Plaintiff notes that "even if a claimant's diagnoses and signs of impairment do not precisely

16 'meet' the criteria specified in a given listing, the Commissioner must still consider whether the

17 claimant's impairments alone or in combination 'equal' the listing. 20 C.F.R. § 404.1520(d),

18 404.1526." (Dkt. 17, at 8.) However, ALJ Dethloff evaluated the medical evidence extensively

19 and found that plaintiff's impairments did not "medically equal" one of the listed impairments.

20 (AR 391.) In addition, "[f]or a claimant to qualify for benefits by showing that his unlisted

21 impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present

22 medical findings equal in severity to *all* the criteria for the one most similar listed impairment."

23 *Sullivan*, 493 U.S. at 891 (emphasis in original); *see also Lewis v. Apfel*, 236 F.3d 503, 514 (9th

24

---

25       [3] As the Commissioner notes, an ALJ is not required to state why a claimant fails to meet
26 a listing, as long as the decision contains an adequate evaluation of the medical evidence.
*Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990).

REPORT AND RECOMMENDATION
RE: SOCIAL SECURITY DISABILITY APPEAL
PAGE - 9

Cir. 2001) (plaintiff must present a plausible theory as to how his impairment or combination of impairments equal a listed impairment). Plaintiff has not identified medical findings that would be equal in severity to all of the criteria set forth in Listing 1.04A.

<u>Plaintiff's Credibility</u>

Plaintiff also argues that the ALJ failed to assess his credibility properly. Absent evidence of malingering, an ALJ must provide clear and convincing reasons to reject a claimant's testimony. *See Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). In finding a social security claimant's testimony unreliable, an ALJ must render a credibility determination with sufficiently specific findings, supported by substantial evidence. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996). "In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ found that plaintiff was "not credible as to his limitations" and devoted approximately two pages to explaining the reasons for this credibility assessment. The ALJ noted as follows:

> In May 1987, shortly after his March 1987 surgery, the claimant indicated that he was improved considerably, and had no shooting pain down the right leg (Exhibit B-9F64).
>
> In March 1989 the claimant described improvement, and noted that he had flares of back pain in bad weather and a low grade continuous back pain which flared <u>if</u> he discontinued Motrin (Exhibit B-9F31). He noted at that time that he could not lift more than 30 pounds, and had been rejected from places he had sought work. Indications that claimant is seeking employment belie allegations of disability. <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001); <u>Jones v. Bowen</u>, 829 F.2d 524, 527 (5th Cir. 1987) (<u>per curium</u>).
>
> In April 1993 claimant was seen complaining of a six month history of severe back

pain, noting a two year history of good relief after his 1988 surgery (Exhibit B-9F24). This is inconsistent with his allegations of continuous disability through 1991. Gaps in treatment may contradict credibility of allegations of disability (20 CFR 404.1529(c)(3)(v); 416.929(c)(3)(v). Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1464 (9th Cir. 1995) (only two contacts regarding back from 1978 to 1985); Stephens v. Shalala, 46 F.3d 37, 39 (9th Cir. 1995) (per curium) (four year absence of treatment for back); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000) (no treatment for two years).

In October 1997 claimant was seen with an eight month history of increasing low back pain (Exhibit B-4F19). Again, this indicates an intermittent, probably activity based, exacerbation of pain, rather than a long term disability.

In February 1998 the claimant's leg pain was termed to be chronic and progressive (Exhibit B-3F25), which appears from other entries in the record to represent the peripheral neuropathy which had its onset around 1996 (Exhibit B-4F13), and has been attributed variously to alcohol abuse, atherosclerosis, or a vitamin B12 deficiency. *See, e.g.* Exhibit B-10F36 (June 2000 neurology evaluation noting that the claimant had a known vitamin B12 deficiency and was not compliant with vitamin B12 injections) and B-13F18 (August 2003 progress note assessing atherosclerosis as the most likely cause of progressive leg pain).

In August 2002 the claimant reported that after his 1988 surgery his legs were markedly improved for a number of years, and he reported that the pain had worsened about a year prior to the date of the August 2002 contact (Exhibit B-12F20). An earlier report in 1999 indicates that he had had progressive pain over the last four months (Exhibit B-10F10). In March 2000, however, he indicated that his pain complaints were minimal (Exhibit B-10F41).

This history, together with the assessments by the VA and the objective examinations noted above, and the claimant's intermittent contacts for treatment over the years regarding his back, indicate that his problems were ameliorated to a significant extent by his second surgery. After the claimant's insured status expired, the lumbar problems subsequently grew worse over time.

In addition, claimant's activities were not consistent with total disability. As is sometimes the situation in cases of remote onset, there is little contemporaneous information available. There are repeated references in the record to claimant working on restoring automobiles (Exhibits B-4F13; B-4F19; B-12F14; B-3F21), and a 2002 reference to an effort to establish a business operating an automobile junkyard (Exhibit B-12F27). He spent a whole day welding in 1993 (Exhibit B-3F52). These references indicate that claimant has consistently performed some activities not consistent with a total disability persisting from his alleged onset to 14 months prior to the filing of his application for disability. In addition, the claimant was active in RV travel (Exhibits B-3F21; B-2F10).

The claimant has not been compliant with treatment. He left his pain management program after only 10 days (Exhibit B-10F36), and more recently has not been compliant with vitamin B-12 shots, which the record clearly indicates was a matter of failure of motivation, as opposed to finances, since the VA is providing his medical needs.

> It is also noted that in September 1987 the claimant was only using aspirin (Exhibit B-9F58), although he has come to rely on narcotics, to the point that Dr. Deger indicated there has been some question of misuse. *See, e.g.*, Exhibits B-13F20 (June 2003 request for early refill of narcotic pain medications so he could travel to a family reunion); B-12F14 (Noting on September 27, 2002 that "He has gone through his percocet pills for break through pain already despite being on MSContin 30 mg poq8 hr").
>
> Also at issue is some degree of motivation. The claimant reported that since he achieved 100% VA disability he had "slowed down." This could be read to support the notion that he had been pursuing some financial benefit from some of the car refurbishing he was involved in. In addition, while he has occasionally indicated some limitations which might be inconsistent with the definition of light work, I conclude that in light of the claimant's repeated attempts to upgrade his VA rating, successful only many years after his insured status expired, his complaints cannot be fully credited in the context of contacts with VA physicians.
>
> Finally, I noted the reference to symptom magnification in connection with the November 1991 VA examination (Exhibit B-9F16). Evidence that claimant is exaggerating complaints justifies discounting testimony. <u>See Batson v. Comm'r of the SSA</u>, 359 F.3d 1190 (9th Cir. 2004) (claimant removed clothing, inconsistent with alleged motion limitation); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9th Cir. 2002) (claimant impeded accurate testing on physical capacity assessments by failing to give maximum of consistent effort); <u>Tonapetyan v. Halter</u> 242 F.3d 1144, 1148 (9th Cir. 2001) (claimant uncooperative during cognitive testing but "much better" when giving reason for being unable to work).

(AR 393-95) (emphasis in original).

The ALJ offered clear and convincing reasons for his credibility assessment. Although plaintiff argues that he presented objective medical evidence of an impairment that could reasonably be expected to cause pain or other symptoms, the ALJ offered sufficient reasons to find that plaintiff's subjective complaints regarding the severity of his symptoms were not credible. *See, e.g. Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1195-97 (9th Cir. 2004).

<u>RFC Assessment</u>

Plaintiff also argues that the ALJ erred in assessing his residual functional capacity (RFC). In the body of his decision, the ALJ assessed plaintiff's RFC as follows:

> The medical source opinions are discussed above. Based on those opinions, the medical record as a whole and the evidence of the claimant's activities, I find that for the period ending March 31, 1991, the claimant retained the functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently and to stand/walk six hours in an eight hour day. He retained the capacity for frequent bending, stooping,

> crouching, and crawling. He had no additional limitations in physical, mental or other abilities affected by his impairments (20 CFR 404.1525). He retained the capacity for an unreduced range of light work (SSR 83-10 and SSR 85-15).

(AR 395.) Plaintiff argues that the RFC assessment failed to take into account his subjective pain complaints and limitations from his right foot drop/right leg problems. He also asserts that the ALJ erred in determining his physical limitations, including his abilities to lift, walk, stand, bend, stoop, crouch, and crawl.

Plaintiff's arguments rely in significant part on his own testimony regarding his limitations. As noted above, however, the ALJ offered sufficient reasons for finding plaintiff's testimony to be not credible. (AR 393-95.)

The ALJ also discounted Dr. Deger's testimony regarding plaintiff's functional limitations. Dr. Deger opined that plaintiff "possibly" would not retain the capacity to stand and walk for six hours in an eight-hour day. (AR 1124.) When asked whether plaintiff could lift and carry ten pounds frequently (a requirement for light work), Dr. Deger stated "I don't know. He might get tired." (AR 1125.) In explaining the weight that he accorded to Dr. Deger's opinions, that ALJ stated as follows:

> I accord some weight, but not controlling weight to Dr. Deger's comments on the issue of claimant's functioning during this period, and the impact of claimant's lumbar impairments. In this regard I accord greater weight to the following opinions of treating sources:
>
> Dr. Hartoch's opinion, on September 27, 1989, that the claimant should be retrained (Exhibit B-9F37).
>
> A treatment plan on September 14, 1999 (almost nine years after expiration of insured status) that the claimant should keep active and busy (Exhibit B-10F9).
>
> The opinion of neurosurgeon Cynthia Hahn, M.D., dated November 18, 19[88], that the claimant could perform light work after a recovery period of eight weeks (Exhibit B-9F33).
>
> The discharge summary of November 14, 19[88], only restricting heavy lifting and indicating that claimant can go back to work in 8 weeks. The summary was prepared by a physician other than Dr. Hahn (Exhibit B-9F36).
>
> Dr. Rankin's opinion in September 1987 that the claimant should lift no more

REPORT AND RECOMMENDATION
RE: SOCIAL SECURITY DISABILITY APPEAL
PAGE - 13

than 20 pounds but should go back to work (Exhibit B-9F60).

Coupled with these opinions is the fact that there is no contemporaneous treating opinion that the claimant cannot work. In addition, the VA has rated the claimant at much less than 100% disability. Historically, he was rated at 20% in 1983 (Exhibit B9-F86); was raised to only 40% in 1987 (Exhibit B-9F66) and this was temporary for recuperation from surgery; was raised to 60% in 1988 (Exhibit B-9F39); and by 1993, was again adjusted from 20% to 40% (Exhibit B-9F1.

In addition, while I have considered the record as a whole, I have specifically considered the findings on physical examinations on September 26, 1989, November 18, 1988, and September 9, 1987. I conclude that the findings on these examinations, contemporaneous to much of the period, while indicating some neurological residuals, fall short of supporting the assessment of Dr. Deger regarding meeting the listing of impairments, and do not support the conclusion of less than a light residual functional capacity.

I have also considered the following comments found in the Statement of the Case provided by the Department of Veterans Affairs in connection with the claimant's appeal of a rating decision. The Statement of the Case is found at Exhibit B-9F, pages 15 through 19, and includes a summary of the medical evidence and adjudication actions.

The entry for May 14, 1990 states:

> A Rating Decision this date reviewed treatment records from June 1988 to December 1989. The hospital report of October 31, 1988, to November 14, 1988, indicated Mr. Valnes was able to gradually return to full work following six to eight weeks of convalescence. Outpatient treatment record on July 14, 1987, indicated he was doing very well and only occasionally needed some pain medication. He still had some complaint of numbness where it had been previously. The 60 percent evaluation was continued and a review examination was scheduled. Mr. Valnes was notified of this decision by letter dated May 25, 1990. The decision became final on May 25, 1991 and was not appealed.

The entry for November 12, 1990 states:

> Mr. Valnes was examined for disability purposes at the Portland VA Outpatient Clinic this date. He was noted to be using high-top tennis shoes and his gait, upon observation in the hallway, appeared to be a relatively normal gait with slightly increased steppage pattern on the right. It was noted (in contrast) that when undressed in the examination room, the gait was more exaggerated. When asked to walk on his heels, he was observed to have active extension of the toes, particularly the extensor hallucis longus. Deep tendon reflexes were 3+ in the right knee, 2+ in the left knee, 2+ in the right ankle, and 2+ in the right ankle. Strength examination revealed the hip flexors were 5/5 bilaterally, hip extensors were 5/5, and abductors and abductors of the hips were 5/5 bilaterally. At the ankles, dorsiflexion on the left was 5/5, and on the right it was noted that Mr. Valnes made no effort. Toe flexion on the left was 5/5 and on the right it was noted that Mr. Valnes made no effort.

> Sensory examination showed decreased appreciation of light touch and pinprick on the right below the knee in a nonanatomic distribution.

The entry for January 13, 1992 states:

> Rating Decision this date reviewed a letter from the Chief of the Portland VA Prosthetics Department dated November 9, 1991, in which Mr. Valnes told him that he rarely, if ever, wore a foot brace. The Rating Decision also reviewed the examination of November 12, 1991. The findings were considered to be no more than moderate in disability level and it was proposed that the service-connected low back disability be reduced to the 20 percent level.

The Statement of the Case includes a decision that the service-connected residuals of the L4-5 surgery with arthritis did not warrant a disability evaluation greater than the 20 percent level. The reasons for that decision included the following:

> Furthermore, the findings of the accumulated evidence of record, including the review examination of November 12, 1991, show that Mr. Valnes has no more than what must be considered a moderate degree of disability. His range of motion is good, and the objective findings on examination indicate there was evidence of symptom magnification during the examination. It was considered significant that the outpatient reports from the Portland VA hospital, where Mr. Valnes related having received treatment, were negative for complaints of back-related problems since 1989. Also considered significant is the prosthetics report which documents that Mr. Valnes has chosen not to wear a brace. As stated above, the examination of November 1991 found that reported symptoms by Mr. Valnes conflicted with the physical findings. In view of the lack of complaints related to back difficulties and the accumulated evidence of record, it is determined that Mr. Valnes has, in fact, had sustained improvement of his low back disability.

(AR 389-91.) The ALJ indicated that these considerations factored into his "rejection of what I regard as a half-hearted and equivocal endorsement of a listing level impairment, and less than light level residual functional capacity assessment by Dr. Deger." (AR 391.)

As noted above, an ALJ may reject a non-examining physician's opinion by reference to specific evidence in the medical record. *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998). Here, the ALJ offered sufficient reasons to discount Dr. Deger's opinions in assessing plaintiff's RFC. In addition, as the ALJ observed, Dr. Deger's opinions regarding plaintiff's lifting, standing, and walking abilities were equivocal at best.

Having discounted the testimony of plaintiff and Dr. Deger, the ALJ found that plaintiff retained the RFC to perform light work. First, the ALJ determined that plaintiff retained the

capacity to lift ten pounds frequently and twenty pounds occasionally, which are the lifting requirements for light work. *See* 20 C.F.R. § 404.1567(b). This finding is supported by substantial evidence. As the ALJ noted, treating physician Dr. Hahn opined in November 1988 that plaintiff could perform light work after a short period of recovery from his second surgery, limiting him to lifting no more than thirty pounds. (AR 275.) Another doctor indicated on a discharge statement in November 1988 that plaintiff could gradually return to full work and was only restricted from heavy lifting. (AR 278.) In addition, the ALJ cited evidence indicating that plaintiff's back condition had improved for a considerable period of time following his second surgery. *See, e.g.*, AR 155, 258-61, 266, 273, 1026. Although Dr. Hartoch opined in September 1989 that plaintiff should be retrained for another occupation that would not involve any stress on his back (AR 274), this opinion does not appear to rule out an ability to perform the lifting requirements for light work.[4]

The ALJ's finding that plaintiff retained the capacity to walk or stand six hours in an eight hour day is also supported by substantial evidence. Dr. Hahn did not impose any restrictions on plaintiff's walking or standing after releasing him to light work in November 1988. In November 1991, shortly after his insured status ended, plaintiff reported that he rarely if ever used a foot brace. (AR 259.) VA reports also indicate that plaintiff was observed walking with a "relatively normal gait" in November 1991, although his "gait was more exaggerated" in the examination room. (AR 258.) In addition, as the ALJ noted, plaintiff reported in 2002 that his "lower extremity symptoms were markedly improved for a number of years" after his second surgery. (AR 1026.)

It is more difficult to assess the ALJ's finding regarding plaintiff's abilities to bend, stoop, crouch, or crawl. There seem to be few if any contemporaneous medical reports that assessed

---

[4] It should be noted that Dr. Hartoch's report indicates that plaintiff should not lift more than 30 pounds (AR 273), which is consistent with Dr. Hahn's opinion.

01 plaintiff's abilities to perform these functions.[5] Nonetheless, there would appear to be substantial
02 evidence in the record as a whole to support the ALJ's determination that plaintiff retained the
03 capacity for frequent bending, stooping, crouching, and crawling as of his last insured date. As
04 discussed above, there is substantial evidence that plaintiff's back condition improved considerably
05 after his surgery in November 1988. This evidence would tend to support a finding that his
06 abilities to bend, stoop, crouch, and crawl were not significantly restricted, at least between
07 November 1988 and his last insured date of March 31, 1991. Although the evidence on this issue
08 may be subject to different interpretations, "[i]n cases where the evidence is susceptible to more
09 than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion
10 must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

### Step Four

12 Based on the RFC assessment discussed above, the ALJ found that plaintiff could not
13 perform his past relevant work as a diesel mechanic, which required heavy lifting. Therefore, the
14 burden shifted to the Commissioner at step five to demonstrate that plaintiff was able to perform
15 other work that exists in significant numbers in the national economy.

### Step Five

17 At step five, the ALJ relied on the Medical-Vocational Rules ("the grids") at 20 C.F.R. pt.
18 404, subpt. P, app. 2 to determine that plaintiff was capable of performing other work in the
19 national economy. Specifically, the ALJ relied on Medical-Vocational Rules 202.21 and 202.22,
20 which directed a finding of not disabled in light of plaintiff's age, education, previous work
21 experience, and ability to perform the exertional requirements of light work. As the Commissioner
22 notes, the grids would also direct a finding of not disabled even if plaintiff had been limited to
23 sedentary work, rather than light work. *See* Medical-Vocational Rules 201.21 and 202.22.

---

[5] Prior to his second surgery in November 1988, Dr. Rankin noted that plaintiff's ability to squat was limited. (AR 301.) In addition Dr. Deger responded affirmatively when the ALJ asked whether plaintiff would be able to bend "occasionally." (AR 1125.) However, the ALJ did not ask Dr. Deger whether plaintiff could bend frequently.

01  Plaintiff argues that the ALJ could not rely on the grids alone at step five because the ALJ
02 erred in finding that plaintiff had no postural restrictions in bending, stooping, crouching, and
03 crawling. If a plaintiff has postural restrictions that significantly limit the range of work permitted
04 by his exertional limitations, an ALJ may be required to call a vocational expert to testify at step
05 five, rather than relying exclusively on the grids. *See Tackett v. Apfel*, 180 F.3d 1094, 1101-02
06 (9th Cir. 1999). As noted above, however, the ALJ's determination regarding plaintiff's ability to
07 bend, stoop, crouch, and crawl prior to his last date insured appears to be supported by substantial
08 evidence, given the improvements in plaintiff's back condition following his second surgery. [6]
09 Therefore, the ALJ did not err at step five by relying on the grids to determine plaintiff's ability
10 to perform other work in the national economy.

## CONCLUSION

12  For the reasons set forth above, it is recommended that the Commissioner's decision in this
13 case should be affirmed. A proposed Order accompanies this Report and Recommendation.

14  DATED this  15th  day of April, 2005.

_Mary Alice Theiler_
Mary Alice Theiler
United States Magistrate Judge

---

[6] It should be noted that even if plaintiff were limited to occasional bending, some courts have suggested that the grids may be used at step five when a claimant is limited to light or sedentary work and can only bend occasionally. *See, e.g.*, *Ortiz v. Secretary of Health & Human Servs.*, 890 F.3d 520, 524-25 (1st Cir. 1989); *see also* SSR 83-14 ("to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would . . . need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job).").